

CHARLES G. LA BELLA (State Bar No. 183448)
STEVEN T. COOPERSMITH (State Bar No. 184646)
LA BELLA & MCNAMARA LLP
401 West A Street, Suite 1150
San Diego, California 92101
Telephone: (619) 696-9200
Facsimile: (619) 696-9269
Email: clabella@labellamcnamara.com
        scoopersmith@labellamcnamara.com

TODD D. THIBODO (State Bar No. 171655)
LAW OFFICES OF TODD D. THIBODO
A PROFESSIONAL CORPORATION
16133 Ventura Boulevard, Suite 580
Encino, California 91436
Telephone: (818) 907-5769
Facsimile: (818) 907-5793
Email: toddthibodo@charter.net

Attorneys for PLAINTIFFS

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

JIM MAXWELL and KAY MAXWELL, )
Individually and as guardians of TREVER )
ALLEN BRUCE and KELTEN TANNER )
BRUCE; and JIM MAXWELL, as executor Of )
the ESTATE OF KRISTIN MARIE )
MAXWELL-BRUCE, )
)
          Plaintiff, )
)
     v. )
)
COUNTY OF SAN DIEGO; ALPINE FIRE )
PROTECTION DISTRICT; VIEJAS FIRE )
DEPARTMENT; DEPUTY LOWELL )
BRYAN "SAM" BRUCE; DOES 1-50, )
)
          Defendants )
_____ )

CASE NO. 07 CV-2385-JAH (WMc)

PLAINTIFFS' MEMORANDUM OF
POINTS AND AUTHORITIES IN
OPPOSITION TO DEFENDANT COUNTY
OF SAN DIEGO'S MOTION TO DISMISS

Date:  February 19, 2008
Time:  2:30 p.m.
Dept:  Courtroom 11

///

///

///

///

23838

# TABLE OF CONTENTS

Page(s)

I.    INTRODUCTION................................................................................................ 1

II.   STATEMENT OF FACTS......................................................................................2

III.  LEGAL STANDARD FOR MOTION TO DISMISS................................................4

IV.   THE COURT SHOULD DENY DEFENDANT'S MOTION TO DISMISS................................4

      A.  Plaintiffs Jim and Kay Maxwell Have Standing to Assert a
          § 1983 Claim for Damages They Suffered Individually......................................4

      B.  Plaintiffs Have Properly Asserted a §1983 Claim on Theories of "Danger-
          Creation" and "Special Relationship."..............................................................6

      C.  Plaintiffs Have Stated a Claim Against Defendant for Monell Liability in
          Their Second Cause of Action............................................................................14

      D.  Plaintiffs Have Stated Valid Claims Against Defendant for Wrongful Death
          and Survival Action in Their Third and Fourth Causes of Action.................15

          1.   Plaintiffs' Wrongful Death and Survival Action Claims Are Not
               Based On "Providing a Gun" or "Negligently Hiring a Killer.".......16

          2.   Plaintiffs Have Stated A Claim Under A California "Special
               Relationship"..........................................................................................17

      E.  Defendant's Claim of "An Incurable Conflict of Interest" Is Frivolous..........20

      F.  Defendant is Not Entitled to a "More Definite Statement" as to Plaintiffs'
          Eighth and Ninth Causes of Action.................................................................21

V.    THE COURT SHOULD GRANT PLAINTIFFS LEAVE TO AMEND...................23

VI.   CONCLUSION....................................................................................................24

1

## TABLE OF AUTHORITIES

2

**Federal Cases**                                                                            **Page(s)**

3

*Balistreri v. Pacifica Police Dept.*
    901 F.2d 696, 699 (9th Cir. 1990)...............................................................4, 13, 23

4

5

*Bradberry v. Pinellas County*
    789 F.2d 1513, 1514-15, 1518 (11th Cir.1986)...........................................9

6

7

*Brewster v. Shasta County*
    275 F.3d 803, 805 (9th Cir. 2001)...............................................................15

8

*Butera v. District of Columbia*
    235 F.3d 637, 651 (D.C.Cir.2001)...............................................................8

9

10

*Cahill v. Liberty Mut. Ins. Co.*
    80 F.3d 336, 337-338 (9th Cir. 1996)...........................................................4

11

12

*City of Canton v. Harris*
    489 U.S. 378, 388 (1989)...............................................................11, 15, 23

13

14

*De La Cruz v. Tormey*
    582 F.2d 45, 48 (9th Cir. 1978)...................................................................4

15

*DeShaney v. Winnebago County Dept. of Soc. Servs.*
    489 U.S. 189 (1989)...............................................................7, 12, 13

16

17

*Doty v. Carey*
    626 F.Supp. 359 (N.D.Ill.1986)...............................................................5, 6

18

19

*Dwares v. City of New York*
    985 F.2d 94, 98-99 (2nd Cir.1993)...........................................................8

20

21

*Edwards v. Occidental Chemical Corp.*
    892 F.2d 1442, 1445 n. 2 (9th Cir.1990).....................................................23

22

*Escamilla v. City of Santa Ana*
    796 F.2d  266 (9th Cir. 1986)...................................................................13

23

24

*Estate of Amos v. City of Page*
    257 F.3d 1086, 1094 (9th Cir. 2001)...........................................................23

25

26

*Estate of Johnson v. Village of Libertyville*
    819 F.2d 174 (7th Cir. 1987)...............................................................4, 5

27

*Freeman v. Ferguson*
    911 F.2d 52, 54-55 (8th Cir.1990)...........................................................8

28

*Graehling v. Village of Lombard, III*
    58 F.3d 295, 297 (7th Cir. 1995)..............................................................4

*Jackson v. Byrne*
    738 F.2d 1443, 1448 (7th Cir.1984)..........................................................9

*Jensen v. Conrad*
    747 F.2d 185 (4th Cir.1984)....................................................................13

*Kallstrom v. City of Columbus*
    136 F.3d 1055, 1066-67 (6th Cir.1998)......................................................8

*Kennedy v. City of Ridgefield*
    439 F.3d 1055, 1061 (9th Cir. 2006).......................................................7, 8

*Ketchum v. Alameda County*
    811 F.2d 1243 (9th Cir. 1987)..............................................................8, 13

*Kneipp v. Tedder*
    95 F.3d 1199, 1201 (3d Cir.1996)........................................................8, 10

*L.W. v. Grubbs*
    974 F.2d 119 (9th Cir.1992).................................................................8, 12

*Monell v. New York City Dept. of Soc. Servs.*
    436 U.S. 658, 691-694 (1978)..............................................................14, 15

*Munger v. City of Glasgow*
    227 F.3d 1082 (9th Cir. 2000).............................................................passim

*Penilla v. City of Huntington Park*
    115 F.3d 707, 711 (9th Cir. 1997)........................................................passim

*Reed v. Gardner*
    986 F.2d 1122, 1125 (7th Cir.1993)............................................................8

*S.E.C. v. Cross Fin. Servs., Inc.*
    908 F. Supp. 718, 726-727 (C.D. Cal. 1995)..................................................4

*Scott v. Eversole Mortuary*
    522 F.2d 1110 (9th Cir.1975)...................................................................23

*Streit v. County of Los Angeles*
    236 F.3d 552, 562 (2001)....................................................................14, 15

*Swierkiewicz v. Sorema N. A.*
    534 U.S. 506 (2002)...............................................................................22

*Uhlrig v. Harder*
    64 F.3d 567, 572 (10th Cir.1995)...............................................................................8

*Wang v. Reno*
    81 F.3d 808 (9th Cir.1996)......................................................................................13

*Wood v. Ostrander*
    879 F.2d 583 (9th Cir.1989)..........................................................................8, 10, 12

**State Cases:**

*Adams v. City of Fremont*
    68 Cal.App. 4th 243 (1998)......................................................................................18

*Clemente v. State of California*
    40 Cal. 3d 202 (1985)........................................................................................17, 18

*County, Lopez v. City of San Diego*
    190 Cal.App. 3d 678 (1987).....................................................................................19

*Davidson v. City of Westminster*
    32 Cal.3d 197 (1982)...............................................................................................18

*de Villers v. County of San Diego*
    156 Cal.App. 4th 238 (2007)..............................................................................15, 16

*Eastburn v. Regional Fire Protection Authority*
    31 Cal.4th 1175, 1185-86 (2003)............................................................................16

*Jackson v. Clements*
    146 Cal.App. 3d 983 (1983).....................................................................................19

*Jacoves v. United Merchandising Corp.*
    9 Cal.App. 4th 88 (1992).........................................................................................15

*McCorkle v. City of Los Angeles*
    70 Cal.2d 252 (1969)...............................................................................................17

*Minch v. California Highway Patrol*
    140 Cal.App. 4th 895 (2006)..............................................................................18, 19

*Shelton v. City of Westminster*
    138 Cal.App. 3d 610 (1982).....................................................................................19

*Tsakos Shipping and Trading, S.A. v. Juniper Garden Town Homes, Ltd.*
    12 Cal.App. 4th 74, 95 (1993)..................................................................................21

*Venegas v. County of Los Angeles*
    32 Cal.4th 820, 826 (2004)..................................................................14

*Von Batsch v. American Dist. Telegraph Co.*
    175 Cal.App. 3d 1111 (1985)............................................................ 18

*Williams v. State of California*
    34 Cal. 3d 18 (1983)...................................................................17, 18

**Federal Statutes:**

42 U.S.C. §1983...................................................................1, 3, 14

Federal Rule of Civil Procedure 15.............................................15

Federal Rule of Civil Procedure 15(a).........................................23

**State Statutes:**

Cal. Code Civ. Proc. §§ 377.60(a), 377.60(b)...................................6

Cal. Code Civ. Proc. §§ 377.61, 377.34.........................................6

Cal. Health & Safety Code § 1799.107..........................................16

1    I.    **INTRODUCTION**

2          San Diego County Deputy Sheriff Lowell Bryan Bruce shot his wife Kristin in the jaw

3    on December 14, 2006. Kristin walked to the phone and called 911. As alleged in the

4    Complaint in this action, when the San Diego County Sheriff's Department responded a few

5    minutes later, the deputies were aware that a fellow deputy was involved, and so they locked

6    down the scene of the shooting. They took Kristin into their custody and control, and held her

7    at the scene for nearly an hour. During this time, the deputies refused to allow her to go to the

8    hospital, and they prevented Kristin's parents (at whose home these events unfolded) from

9    doing anything to help her. In addition, and as alleged, what medical care the deputies did

10   provide was grossly negligent and demonstrated deliberate indifference to her obvious

11   medical condition. As a result of these actions, Kristin asphyxiated on her own blood and

12   died nearly an hour later, while she was still in the deputies' custody.

13         In its Motion to Dismiss, the County claims, first, that Kristin's parents have no

14   standing to pursue a claim under 42 U.S.C. §1983 on their own behalf for the death of their

15   daughter.

16         The County next asserts that it is blameless in Kristin's death and cannot be held

17   responsible. It claims that it cannot be held responsible under §1983, because it did not

18   "affirmatively place[] the plaintiff in a position of danger." The County also claims that it

19   cannot be held responsible under state law, because it did not owe any duty to Kristin. The

20   crux of the County's position is that deputy sheriff Bruce shot Kristin, and Bruce was not

21   acting under color of law. The County claims that it cannot be held responsible for

22   negligently hiring Bruce, and, therefore, it is blameless.

23         Finally, the County attempts to use Kristin's two young children as a shield, arguing

24   that the *hypothetical possibility* that the children could assert the "far-fetched" and "unfair"

25   claims that Kristin's parents "caused [Kristin]'s suffering and death" creates an "incurable

26   conflict" between the children and Kristin's parents.

27         The Court should flatly reject Defendant's arguments.

28

1    **First**, Kristin's parents clearly have standing to assert a claim for deprivation of their

2    interest in a familial relationship with their daughter.

3    **Second**, the County completely overlooks the affirmative actions the Sheriff's

4    Department took in locking down the scene, in seizing Kristin, in holding her in its custody

5    for nearly an hour, in refusing to allow her to go to the hospital, and in preventing her and/or

6    her parents from doing anything to help her.  It further ignores Plaintiffs' allegations of

7    Defendants' deliberate indifference to Kristin's medical needs and Defendants' gross

8    negligence.  Kristin was alive and able to walk to the phone and call 911 after the shooting.

9    By locking down the scene and taking control of Kristin, sheriff's deputies created a

10   relationship that gave rise to a duty of care, under State Law and Federal Law.  In refusing to

11   allow Kristin to be taken to the hospital, in refusing to allow her parents or others to help her,

12   and in providing grossly negligent care, sheriff's deputies significantly *increased* the danger

13   Kristin was facing.  Plaintiffs have alleged that Defendant deprived Kristin and themselves of

14   their Constitutional rights by deliberate indifference to Kristin's medical needs and gross

15   negligence in providing medical care while Kristin was in Defendant's custody.  Plaintiffs

16   have also alleged that Defendant owed a duty of care to Kristin under California tort law

17   when it locked down the scene of the shooting, seized Kristin and held her in its custody for

18   nearly an hour, refused to allow her to go to the hospital, and prevented her and/or her parents

19   from doing anything to help her.

20   **Third**, there is not even a potential conflict between Kristin's children and her

21   parents, much less an "incurable" actual conflict.  The County has manufactured this red

22   herring as a last ditch attempt at dismissal.  The "conflict" argument is specious.

23   For all of these reasons, the Court should deny Defendant's motion to dismiss.

24   **II.    STATEMENT OF FACTS**

25   Defendant County of San Diego ("Defendant" or "County") sheriff's deputy Lowell

26   Bryan Bruce ("Bruce") shot his wife Kristin Maxwell Bruce ("Kristin") in the jaw at the

27   home of Kristin's parents Jim Maxwell ("Jim") and Kay Maxwell ("Kay") on December 14,

28

1    2006. (Complaint, ¶¶ 1, 31.) Kristin was seriously injured, but she was able to walk to the

2    telephone and call 911. (Complaint, ¶¶ 3, 32.) The San Diego County Sheriff's Department

3    responded, and when it arrived minutes later, it locked down the scene of the shooting.

4    (Complaint, ¶¶ 3, 35, 36.)

5         While clearly acting under color of law and in the course and scope of their

6    employment, sheriff's deputies locked down the scene of the shooting and refused to allow

7    Kristin to be transported to the hospital. (Complaint, ¶¶ 13, 36.) They refused to allow Jim

8    or Kay to see or speak with Kristin. (Complaint, ¶ 37.) When Jim tried to walk down his

9    driveway to see his wife, an unknown defendant sheriff's deputy hit him with a baton and

10   pepper-sprayed him in the face. (Complaint, ¶¶ 37, 67, 72.)

11        Defendant showed deliberate indifference to Kristin's obvious medical needs, and

12   they provided her with grossly negligent emergency medical care. (Complaint, ¶¶ 38, 41.)

13   As a result, Kristin suffocated and drowned in her own blood; she died at the scene nearly an

14   hour after being shot, while still in the deputies' custody. (Complaint, ¶¶ 3, 38.) The

15   Maxwells found out their daughter had died only after the news media had already reported

16   it, and Defendants caused the news media to believe that Jim was a suspect who had been

17   arrested for the shooting of his daughter. (Complaint, ¶¶ 37, 78, 84.)

18        Before Bruce was hired by the County, he had failed the County's psychological

19   examination twice. The County knew that Bruce was psychologically unfit and prone to

20   violence. (Complaint, ¶¶ 2, 18, 19.) Prior to hiring him, the County also knew that Bruce

21   had been rejected for employment by several other law enforcement agencies. (Complaint,

22   ¶¶ 20-30.) The County hired Bruce as a result of careless and reckless hiring policies that

23   amounted to deliberate indifference to the rights of the individuals who its officers come

24   into contact with, including Kristin Maxwell Bruce. (Complaint, ¶¶ 45, 49, 50.)

25        Plaintiffs' complaint alleges causes of action against the County for violation of 42

26   U.S.C. §1983, wrongful death, survival action, excessive force, battery, intentional infliction

27   of emotional distress, and negligent infliction of emotional distress.

28

---

III.    **LEGAL STANDARD FOR MOTION TO DISMISS**

A Rule 12(b)(6) motion tests the legal sufficiency of the claim or claims stated in the complaint. When considering a Rule 12(b)(6) motion to dismiss, a trial court must decide whether the facts alleged, if true, would entitle plaintiff to some form of legal remedy. Unless the answer is unequivocally no, the motion must be denied. De La Cruz v. Tormey, 582 F.2d 45, 48 (9th Cir. 1978); S.E.C. v. Cross Fin. Servs., Inc., 908 F. Supp. 718, 726-727 (C.D. Cal. 1995). Dismissal is proper only where there is either a "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory." Balistreri v. Pacifica Police Dept., 901 F.2d 696, 699 (9th Cir. 1990). "A suit should not be dismissed if it is possible to hypothesize facts, consistent with the complaint, that would make out a claim." Graehling v. Village of Lombard, III, 58 F.3d 295, 297 (7th Cir. 1995).

In resolving a Rule 12(b)(6) motion to dismiss, the trial court must (1) construe the complaint in the light most favorable to the plaintiff; (2) accept all well-pleaded factual allegations as true; and (3) determine whether plaintiff can prove any set of facts to support a claim that would merit relief. Cahill v. Liberty Mut. Ins. Co., 80 F.3d 336, 337-338 (9th Cir. 1996).

IV.    **THE COURT SHOULD DENY DEFENDANT'S MOTION TO DISMISS**

A.    **Plaintiffs Jim and Kay Maxwell Have Standing to Assert a §1983 Claim for Damages They Suffered Individually.**

Defendant admits that Trever Bruce ("Trever") and Kelten Bruce ("Kelten") and Kristin's estate are proper plaintiffs under the first cause of action, (Motion, pp.22:21-28), but it asserts that Jim and Kay are not proper plaintiffs for this claim, citing Estate of Johnson v. Village of Libertyville, 819 F.2d 174 (7th Cir. 1987). Defendant is incorrect on this point.

Contrary to Defendant's argument, Estate of Johnson did *not* determine that decedent's parents could not assert a § 1983 claim on their own behalf. The Court of Appeals held that the parents could not assert the claim on behalf of the estate as a "special

4

1  administrator" at the same time the administrator of the estate, decedent's husband, was

2  pursuing claims on behalf of the estate in several other lawsuits.  Indeed, as to the parents'

3  standing to bring a §1983 claim on their own behalf, the Court of Appeals clearly believed

4  they could have brought a claim, had they chosen to do so.  The problem for the parents was

5  that they did not allege a claim on their own behalf: "[T]he [parents]' complaint did not

6  plead any individual injuries but only sought recovery for injuries sustained by the decedent.

7  . . . . Because of the obvious defect in failing to plead individual injury to themselves,

8  however, the suit was dismissed at the pleading stage.  Plaintiffs must assert their own legal

9  rights and interests." Johnson, 819 F.2d at 177-178.  Thus, the Court did not hold that the

10  parents had no individual § 1983 claim for the death of their daughter, it merely held that

11  they failed to assert one.

12      Other cases have held that parents *do* have an individual right to assert a § 1983

13  claim for damages they suffer individually.  In Doty v. Carey, 626 F.Supp. 359

14  (N.D.Ill.1986), the court held that parents were permitted to bring a §1983 claim on their

15  own behalf, despite the fact that they would not be proper plaintiffs under Illinois' Wrongful

16  Death Act.  The Court stated that Illinois' Wrongful Death Act did not permit parents to sue

17  on their own behalf unless they were "next of kin," and they would not be next of kin if their

18  deceased child left children of his own.  Doty, 626 F. Supp. at 364.  The court further

19  explained:

20      Illinois' wrongful death law is so weighted toward economic factors
        that it conflicts with law based on a policy of compensation for loss
21      of companionship and destruction of family relationships.  Yet,
        compensation for such losses . . . is precisely the meaning and
22      purpose of a § 1983 loss of society claim.

23
        Illinois tort law for wrongful death is inconsistent with the meaning
24      and purpose of §1983 in several key respects. . . . . For a parent's
        claim for loss of society of his son, it permits no right of action
25      independent from the wrongful death claim.  A civil rights action
        should include all of these.  Further, it awards and distributes
26      damages on the basis of economic factors, whereas federal civil
        rights concerns demand compensation for intangible losses.
27

28

1    Plaintiffs have § 1983 actions which are separate and distinct from
the Illinois wrongful death claim.

2    Doty, 626 F. Supp. at 364 (citations omitted).  California's wrongful death statute is similar

3    in operation to the Illinois wrongful death statute in Doty v. Carey.  First, a decedent's

4    surviving parents would not have standing where the decedent had children, unless the

5    surviving parents were dependent on the decedent.  Cal. Code Civ. Proc. §§ 377.60(a),

6    377.60(b).  (Thus, Plaintiffs' third cause of action for wrongful death is brought by Plaintiffs

7    in their capacity as guardians of Trever and Kelten.)  Second, there could be no recovery of

8    punitive damages.  Cal. Code Civ. Proc. §§ 377.61, 377.34.  Thus, in this case, Jim and Kay

9    have properly asserted a § 1983 claim for damages they suffered individually.  See also

10   Penilla v. City of Huntington Park, 115 F.3d 707, 711 (9th Cir. 1997) (stating that

11   decedent's mother "could pursue her own rights under the Fourteenth Amendment for

12   deprivation of her liberty interest in her familial relationship with her son"); Munger v. City

13   of Glasgow, 227 F.3d 1082 (9th Cir. 2000) (parents filed claim for constitutional violations

14   by county sheriff's department and police department individually, and on behalf of their

15   decedent son's estate).

16   **B.    Plaintiffs Have Properly Asserted a § 1983 Claim on Theories of
17   "Danger-Creation" and "Special Relationship."**

18   Next, the County contends that it cannot be liable under § 1983 because (1) "Bruce

19   did not act under color of law" (Motion, p.23:3 (referring to Section IV. C.)); (2) the County

20   is not liable for hiring Bruce under a § 1983 (Motion, p.23:3 (referring to Section IV. E.));

21   and (3) the County is not liable on a "danger-creation" theory based on Bruce's actions

22   (Motion, p.23:3 (referring to Section IV. E.)).

23   The County's arguments simply ignore the acts of County employees, other than

24   Bruce, who are alleged to have caused Kristin's death.

25   Plaintiffs specifically allege that after Kristin called 911 for help, the San Diego

26   Sheriff's Department responded, but the scene of the shooting quickly became a scene of

27   chaos and disorder "under the direction and control of the Sheriff's Department. . . ."

28

6

1   (Complaint, ¶ 3 (emphasis added).)  Plaintiffs allege that "Sheriff's Deputies <u>locked down</u>

2   <u>the scene and refused to let Kristin be taken to the hospital</u>[, and] . . . the Sheriff's

3   Department allowed Kristin to suffocate on her own blood" nearly an hour after she called

4   911.  (Complaint, ¶¶ 3, 36 (emphasis added)).  Plaintiffs also allege that sheriff's deputies,

5   acting under color of law and within the course and scope of their employment, caused

6   Kristin's death by locking down the scene of the shooting, by seizing Kristin and taking

7   custody of her, by refusing to allow Kristin to be taken to the hospital, by refusing to allow

8   Jim and Kay to attend to Kristin, by performing emergency medical services in a grossly

9   negligent manner and by deliberate indifference to her obvious medical needs.  (<u>See</u>

10  Complaint, ¶¶ 3, 4, 35, 36, 37, 38, 41.)  These allegations are sufficient to state a §1983

11  claim against the County, under the "danger-creation" and "special relationship" exceptions

12  to <u>DeShaney v. Winnebago County Dept. of Soc. Servs.</u>, 489 U.S. 189 (1989).

13         The government's failure to protect an individual from harm, as a general rule, is not

14  a violation of the injured person's due process rights.  <u>DeShaney v. Winnebago County</u>

15  <u>Dept. of Soc. Servs.</u>, 489 U.S. 189 (1989).  In <u>DeShaney</u>, Joshua DeShaney and his mother

16  contended that the Winnebago County Social Services Department deprived Joshua of

17  liberty without due process of law in violation of the Fourteenth Amendment by failing to

18  protect him from violence at the hands of his father.  <u>DeShaney</u>, 489 U.S. at 191, 109 S.Ct.

19  at 1001.  The Supreme Court held that the state was not constitutionally obligated to protect

20  Joshua, stating, "[a]s a general matter, then, we conclude that a State's failure to protect an

21  individual against private violence simply does not constitute a violation of the Due Process

22  Clause."  <u>Id.</u> at 197, 109 S.Ct. at 1004.

23         There are two well-recognized exceptions to this general rule of <u>DeShaney</u>.  First,

24  there is a "danger-creation" exception, which arises when affirmative government action

25  creates a danger or exposes a person to a danger that he or she otherwise would not have

26  faced.  <u>Kennedy v. City of Ridgefield</u>, 439 F.3d 1055, 1061 (9th Cir. 2006) (quoting

27  <u>DeShaney</u>, 489 U.S. at 197).  The "danger-creation" exception or "state-created danger"

28

CASE NO. 07 CV-2385-JAH (WMc)
PLAINTIFFS' MEMO OF Ps AND As IN OPPOSITION TO DEFENDANT COUNTY'S MOTION TO DISMISS

1    doctrine actually pre-dates <u>DeShaney</u> (<u>see</u> <u>Kennedy</u>, 439 F.3d at 1061, n. 1 (citing cases)),

2    but it was first recognized in the Ninth Circuit in <u>Wood v. Ostrander</u>, 879 F.2d 583 (9th

3    Cir.1989).  The doctrine is "well established law in seven [other] circuits."  <u>Kennedy</u>, 439

4    F.3d at 1061 (citing <u>Butera v. District of Columbia</u>, 235 F.3d 637, 651 (D.C.Cir.2001);

5    <u>Dwares v. City of New York</u>, 985 F.2d 94, 98-99 (2nd Cir.1993); <u>Kneipp v. Tedder</u>, 95 F.3d

6    1199, 1201 (3d Cir.1996); <u>Kallstrom v. City of Columbus</u>, 136 F.3d 1055, 1066-67 (6th

7    Cir.1998); <u>Reed v. Gardner</u>, 986 F.2d 1122, 1125 (7th Cir.1993); <u>Freeman v. Ferguson</u>, 911

8    F.2d 52, 54-55 (8th Cir.1990); <u>Uhlrig v. Harder</u>, 64 F.3d 567, 572 (10th Cir.1995)).

9          In <u>Wood v. Ostrander</u>, 879 F.2d 583 (9th Cir. 1989), a woman was raped after the car

10    in which she was a passenger was impounded by a police officer, and she brought a §1983

11    suit against the officer.  The Court of Appeals held that because the officer "affirmatively

12    placed the plaintiff in a position of danger," the officer could be held liable under §1983.

13    <u>Wood</u>, 879 F.2d at 589-90 (quoting <u>Ketchum v. County of Alameda</u>, 811 F.2d 1243, 1247

14    (9th Cir.1987)).

15          The Ninth Circuit also applied the danger-creation exception in <u>L.W. v. Grubbs</u>, 974

16    F.2d 119 (9th Cir.1992).  In <u>Grubbs</u>, a registered nurse employed by the state of Oregon at a

17    medium-security custodial institution was assaulted by an inmate and brought suit against

18    state prison officials.  The Court held that the prison officials could be held liable under

19    §1983 because they "created the danger to which [the plaintiff] fell victim" by selecting a

20    violent sex offender to work alone with her.  <u>Id.</u> at 121.  The Court explained that the

21    "danger-creation . . . necessarily involves affirmative conduct on the part of the state in

22    placing the plaintiff in danger."  <u>Id.</u>

23          Other Ninth Circuit decisions applying the danger-creation exception are also

24    instructive.  In <u>Penilla v. City of Huntington Park</u>, 115 F.3d 707 (9th Cir. 1997), Juan Penilla

25    was on the porch of his home in Huntington Park, California when he became seriously ill.

26    Neighbors and a passerby called 911 and attempted to assist Penilla until emergency

27    services arrived.  Huntington Park Police Officers Settles and Tua arrived first.  They

28

---

8

1   examined Penilla, and found him to be in grave need of medical care.  However, they

2   cancelled the request for paramedics, broke the lock on the front door of Penilla's residence,

3   moved him inside the house, locked the door, and left at approximately 11:30 a.m.  The next

4   day, family members found Penilla dead on the floor inside the house.  Penilla died as a

5   result of respiratory failure.  Id. at 708.

6         Penilla's mother and estate brought a § 1983 action against the City of Huntington

7   Park, its police department, its chief of police, and Officers Settles and Tua.  The District

8   Court denied the City of Huntington Park's 12(b)(6) motion to dismiss, and the Court of

9   Appeals affirmed.  Id.

10         In response to plaintiffs' cause of action for violation of the Fourteenth Amendment,

11   deprivation of life without due process of law, the officers argued that they did not owe a

12   constitutional duty to provide medical care to Penilla "and that even if they did owe him

13   such a duty, they did not cause his death."  Id. at 709.  The Court of Appeals rejected this

14   argument, stating, "Appellees do not allege that these officers attempted, but failed, to

15   rescue Penilla, or even that they should have, but did not, attempt to rescue him.  Their

16   allegation is that the officers placed Penilla in danger in deliberate indifference to his

17   medical needs."  Id.[1]

18         Finally, the Court of Appeals stated, "[t]he cause of Penilla's death was a factual

19   issue.  The officers' alleged conduct, however, clearly placed Penilla in a more dangerous

20

21   [1]     The Court also rejected the officers' attempt to "characterize this case as similar to
     situations in which § 1983 liability has been rejected for . . . conduct during failed rescues or
22   in situations where they did not affirmatively cause harm.  See, e.g., Jackson v. Byrne, 738
     F.2d 1443, 1448 (7th Cir.1984) (firefighters not liable for death of children during
23   firefighters' strike); Bradberry v. Pinellas County, 789 F.2d 1513, 1514-15, 1518 (11th
     Cir.1986) (no liability for lifeguard because '[t]he state did not kill [decedent], the ocean
24   did.')."  Penilla, 115 F.3d at 709-710.  The Court stated these cases are inapposite.  The
     officers in this case allegedly took affirmative actions that significantly increased the risk
25   facing Penilla: they cancelled the 911 call to the paramedics; they dragged Penilla from his
     porch, where he was in public view, into an empty house; they then locked the door and left
26   him there alone.  And they allegedly did so after they had examined him and found him to be
27   in serious medical need.  Id. at 710.

28

1  position than the one in which they found him. We agree with the district court that by

2  cancelling the 911 call, removing Penilla from public view, and locking the front door, the

3  officers made it impossible for anyone to provide emergency medical care to Penilla." Id.

4        In Munger v. City of Glasgow, 227 F.3d 1082 (9th Cir. 2000), Munger was drinking

5  in a bar on a "bitter cold" night in Montana. When he became belligerent and began arguing

6  with other patrons, the bartender called the police, and the police ejected Munger from the

7  bar. Id. at 1084. Munger was not permitted to reenter the bar, and one of the officers told

8  him not to drive his truck, which was parked nearby. Id. Munger then walked away from

9  police toward an abandoned railway, wearing only a t-shirt. The police "allegedly went

10 looking for him" but did not find him. Id. Munger died of hypothermia, and his body was

11 found the next day, "curled up in an alleyway two blocks from Stan's Bar." Id. Munger's

12 mother and father filed suit against the individual police officers, the city police department

13 and the county sheriff's department, alleging violations of § 1983 and state law negligence.

14 The District Court granted summary judgment to the individual officers on qualified

15 immunity grounds and granted summary judgment to the police department and sheriff's

16 department in light of the summary judgment in favor of the individual officers. Id.

17       The Court of Appeals reversed the summary judgment in favor of the individual

18 officers, finding that the "danger-creation" doctrine applied to the facts of the case because

19 the officers affirmatively placed Munger in danger. Id. at 1087. The Court stated, "[i]n

20 examining whether an officer affirmatively places an individual in danger, we do not look

21 solely to the agency of the individual, nor do we rest our opinion on what options may or

22 may not have been available to the individual. Instead, we examine whether the officers left

23 the person in a situation that was more dangerous than the one in which they found him."

24 Id. at 1086. After discussing the Ninth Circuit cases of Wood v. Ostrander, supra, and

25 Penilla v. City of Huntington Park, supra, and the Third Circuit decision in Kneipp v.

26 Tedder, 95 F.3d 1199 (3rd Cir. 1996), the Court of Appeals held:

27

28

1

> [T]he district court erred in concluding that the officers did not
> affirmatively place Munger in a position of danger. The officers
> affirmatively ejected Munger from a bar late at night when the
> outside temperatures were subfreezing. They knew that Munger was
> wearing only a t-shirt and jeans, was intoxicated, was prevented by
> the officers from driving his truck or reentering Stan's Bar, and was
> walking away from the nearby open establishments. Furthermore, the
> fact that the officers went looking for Munger (or so claim),
> demonstrates that they were aware of the danger that he was in. It
> would seem indisputable, under this version of the facts, that the
> officers placed Munger "in a more dangerous position than the one in
> which they found him." Penilla, 115 F.3d at 710. The district court
> therefore erred in granting the officers qualified immunity as a matter
> of law.

9  Munger, 227 F.3d at 1087. The Court also reversed summary judgment in favor of the

10  police department and the sheriff's department. Citing Monell, the Court stated that "[t]o

11  hold a police department liable for the actions of its officers, the Mungers must demonstrate

12  a constitutional deprivation, and show that the deprivation was visited pursuant to a police

13  department custom or policy." Munger, 227 F.3d at 1087. The Court further stated that the

14  inadequacy of police training may serve as the basis for §1983 liability where "the failure to

15  train amounts to deliberate indifference to the rights of persons with whom the police come

16  into contact." Id. (quoting City of Canton v. Harris, 489 U.S. 378 (1989)). While it did not

17  appear that plaintiffs specifically alleged failure to train, and the record of the training

18  customs and policies was not fully developed, the Court found:

> [T]he adequacy of this training is called into question by the officers'
> inappropriate handling, in this case, of a person who was obviously
> drunk and uncooperative. It also appears that the police departments
> may have failed to train their officers regarding the duty that arises
> when, through an officer's affirmative conduct, he or she exposes a
> person to potential danger from the elements or from a third person.
> Possibly the police departments failed to give necessary training to
> their officers regarding the special dangers posed by the harsh
> Montana winters.

25  Munger, 227 F.3d at 1088. Accordingly, the Court reversed the grant of summary judgment

26  in favor of the police department and sheriff's department for consideration of whether the

27

28

---

11

1  constitutional violation "was caused by the police departments' deliberate indifference in

2  failing to adequately train the officers." Id.

3       In the present case, Plaintiffs have alleged that the sheriff's deputies caused Kristin's

4  death by locking down the scene of the shooting, by seizing Kristin and taking custody of

5  her, by refusing to allow Kristin to be taken to the hospital, by refusing to allow Jim and

6  Kay to attend to Kristin, by performing emergency medical services in a grossly negligent

7  manner and by deliberate indifference to her obvious medical needs.  Under the Ninth

8  Circuit's analysis in Wood, Grubbs, Penilla and Munger, Plaintiffs have sufficiently alleged

9  affirmative conduct by the County, so as to give rise to the applicability of the "danger-

10  creation" exception to DeShaney.

11       Plaintiffs have also alleged facts sufficient to state a claim under the "special

12  relationship" exception to DeShaney.  In DeShaney, the Supreme Court stated that "when

13  the State takes a person into its custody and holds him there against his will, the Constitution

14  imposes upon it a corresponding duty to assume some responsibility for his safety and

15  general well-being." DeShaney, 489 U.S. 189 at 199-200.  The Court stated:

16       The rationale for this principle is simple enough:  when the State by the
17       affirmative exercise of its power so restrains an individual's liberty that it
        renders him unable to care for himself, and at the same time fails to provide
18       for his basic human needs, e.g., food, clothing, shelter, medical care, and
        reasonable safety, it transgresses the substantive limits on state action set
19       by the Eighth Amendment and the Due Process Clause.  The affirmative
        duty to protect arises . . . from the limitation which it has imposed on his
20       freedom to act on his own behalf.  In the substantive due process analysis,
        it is the State's affirmative act of restraining the individual's freedom to act
21       on his own behalf,  through incarceration, institutionalization, or other
        similar restraint of personal liberty  which is the "deprivation of liberty"
22       triggering the protections of the Due Process Clause[.]

23  Id. (citations omitted).

24

25       To determine whether a "special relationship" exists, courts may look to a number of

26  factors, including (1) whether the state created or assumed a custodial relationship toward

27

28

─────────────────────────────

12

1   the plaintiff; (2) whether the state affirmatively placed the plaintiff in a position of danger;

2   (3) whether the state was aware of a specific risk of harm to the plaintiff; or (4) whether the

3   state affirmatively committed itself to the protection of the plaintiff. Balistreri v. Pacifica

4   Police Dept., 901 F.2d 696, 700 (9th Cir. 1990). See also, Ketchum v. Alameda County,

5   811 F.2d 1243 (9th Cir. 1987); Escamilla v. City of Santa Ana, 796 F.2d 266 (9th Cir.

6   1986); Jensen v. Conrad, 747 F.2d 185 (4th Cir.1984).

7          In Wang v. Reno, 81 F.3d 808 (9th Cir.1996), the Court of Appeals found both

8   "danger-creation" and the existence of a "special relationship."  The basic facts of the case

9   were that federal prosecutors brought Wang, a Chinese citizen, into the United States to

10   testify as a witness in a drug case. Wang's subsequent truthful trial testimony "raised the

11   possibility that he would be executed" if he returned to China. Id. at 811.  After the trial, the

12   government attempted to deport Wang to China, and Wang sued, claiming, among other

13   things, violation of his Fifth Amendment due process rights. Id. at 816-817. The Court of

14   Appeals disagreed with the government's argument that it had no constitutional duty to

15   protect Wang, finding that both the "danger-creation" and "special relationship" exceptions

16   to DeShaney applied. Id. at 818.  With respect to a "special relationship," the Court

17   explained:

18   > The government created a special relationship with Wang by
19   > paroling him into the United States and placing him in custody.
> See, e.g., DeShaney v. Winnebago County Department of Social
20   > Services, 489 U.S. 189, 199-200, 109 S.Ct. 998, 1005, 103
> L.Ed.2d 249 (1989).  In DeShaney, the Court held that when the
21   > government creates a special relationship with a person by placing
> him in a vulnerable situation, the substantive component of the
22   > Due Process Clause obligates the government to provide for that
> person's basic needs and to protect him from deprivations of
23   > liberty. Id. at 199-200, 109 S.Ct. at 1005.  Having placed Wang
> in custody, the government had an obligation to protect him from
24   > liberty deprivations he faced by virtue of his testimony in court.

25

26   Wang, 81 F.3d at 818 (footnote omitted).  In this case, Plaintiffs have alleged the County

27   locked down the scene of the shooting and took Kristin into its custody and control.  Having

28

1  placed this restraint on her personal liberty, and having imposed limitations on her freedom

2  to act on her own behalf, Defendant placed Kristin in a vulnerable situation, and they were

3  obligated to protect her from deprivations of life and liberty.  Plaintiffs have adequately

4  alleged a "special relationship" in this case.

5        C.    **Plaintiffs Have Stated a Claim Against Defendant for Monell Liability in**

6                **Their Second Cause of Action.**

7        The County next challenges Plaintiffs' Second Cause of Action for § 1983 liability

8  pursuant to <u>Monell v. New York City Dept. of Soc. Servs.</u>, 436 U.S. 658, 691-694 (1978).

9  (Motion, 23:6-24.)  Relying on <u>Venegas v. County of Los Angeles</u>, 32 Cal.4th 820, 826

10  (2004), the County argues that it cannot face §1983 <u>Monell</u> liability, because the sheriff is a

11  state actor, not a county actor.  Defendant's reliance on <u>Venegas</u> is misplaced.  In <u>Venegas</u>,

12  Plaintiffs sued the City of Vernon, the Vernon Police Department, the County of Los

13  Angeles and its sheriff's department, sheriff and deputies, alleging, among other claims,

14  violation of 42 U.S.C. § 1983 for unreasonable search and seizure, and false detention and

15  arrest.  The question the California Supreme Court addressed was whether "a sheriff act[s]

16  on behalf of the state or county when conducting a criminal investigation, including

17  detaining suspects and searching their home and vehicle." <u>Venegas</u>, 32 Cal. 4th at 826.

18        The California Supreme Court held that sheriffs acted on behalf of the state <u>when</u>

19  <u>performing law enforcement activities</u> and were, therefore, immune from 42 U.S.C. §1983

20  liability under the Eleventh Amendment to the United States Constitution.  <u>Id</u>.

21  "Accordingly, as agents of the state <u>when acting in their law enforcement roles</u>, California

22  sheriffs are likewise absolutely immune from prosecution for asserted violations of that

23  section." <u>Id</u>. (emphasis added).

24        The Court did not hold or imply in any way that California sheriffs act for the state

25  where they are not acting in their law enforcement roles, and courts have specifically found

26  California sheriffs to be *county* actors in other capacities.  In <u>Streit v. County of Los</u>

27  <u>Angeles</u>, 236 F.3d 552, 562 (2001), the Ninth Circuit, after surveying relevant California

28

1   law, held that "various state provisions lead inexorably to the conclusion that the [Los

2   Angeles Sheriff's Department] is tied to the County in its *political, administrative, and fiscal*

3   *capacities*.  Therefore, the County appears subject to liability for the LASD's actions."  Id.

4   at 562.  The Venegas decision cited Streit several times in its opinion, but it did not

5   disapprove Streit as it did Brewster v. Shasta County, 275 F.3d 803, 805 (9th Cir. 2001).  In

6   the present case, County's liability is not based on the sheriff's performance of law

7   enforcement activities.  Rather, as Defendant concedes, County's Monell liability is

8   predicated, in part, on its hiring policies, i.e., its administrative and fiscal capacities.  Thus,

9   under the Court of Appeal's holding in Streit, the sheriff is a county actor, and the County is

10  liable for its hiring actions.  Streit, 236 F.3d at 562.[2]

11      **D.**      **Plaintiffs Have Stated Valid Claims Against Defendant for Wrongful**
                **Death and Survival Action in Their Third and Fourth Causes of Action.**
12

13          County argues that Plaintiffs' Third and Fourth Causes of Action, state law claims

14  for wrongful death and survival action, should be dismissed because (1) there is "no County

15  liability for providing a gun," (2) there is "no County liability for negligently hiring a killer,"

16  and (3) there is no state law liability on a "danger-creation tort theory."  (Motion, pp.24:1-

17  14.)  The first and second parts of its argument are nothing more than "straw men," which

18  the County has set up to conveniently allow it to argue de Villers v. County of San Diego,

19  156 Cal.App. 4th 238 (2007) and Jacoves v. United Merchandising Corp., 9 Cal.App. 4th 88

20  (1992).

21

22  _____

    2       In any event, Defendant has not argued that it is entitled to qualified immunity, and
23  it does not appear on the face of the pleadings that Defendant would be entitled to qualified
    immunity.  See, e.g., Penilla, 115 F.3d at 711 (stating that it was clearly established as of 1994
24  that "a state actor in this circuit has a constitutional duty under the due process clause to
    protect an individual where the state places that individual in danger through affirmative
25  conduct.")  In addition, as set forth below in Section V, pursuant to Federal Rule of Civil
    Procedure 15, Plaintiffs request leave to amend their complaint in order to clearly state a
26  claim under City of Canton v. Harris, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989),
    for Monell liability based on inadequate training.
27

28

1    The state law causes of action in Plaintiffs' complaint are not predicated on

2  "providing a gun" or "negligently hiring a killer."  Accordingly, the Court should reject

3  Defendant's argument.

4
   ### 1. Plaintiffs' Wrongful Death and Survival Action Claims Are Not Based on "Providing a Gun" or "Negligently Hiring a Killer."

5

6    While Plaintiffs do allege that the County was negligent or reckless in hiring the

7  psychologically-unfit and violence-prone Bruce, the only cause of action predicated on the

8  County's hiring policies is the Second Cause of Action for <u>Monell</u> liability.  Thus, while the

9  County argues that the sole factual bases for liability on the third and fourth causes of action

10 are its negligent hiring of Bruce and its having provided him with a weapon, this is plainly

11 incorrect.

12    Plaintiffs have alleged that "Sheriff's Deputies locked down the scene and refused to

13 let Kristin be taken to the hospital[, and] . . . the Sheriff's Department allowed Kristin to

14 suffocate on her own blood" nearly an hour after she called 911.  (Complaint, ¶¶ 3, 36.)

15 Plaintiffs also allege that sheriff's department employees caused Kristin's death by

16 performing emergency medical services in a grossly negligent manner.  (Complaint, ¶ 38.)

17    None of these allegations are based on the County's negligent hiring of Bruce or its

18 providing him with a weapon.  In addition, the sheriff's department deputies were clearly

19 acting within the course and scope of their employment when they arrived at the Maxwells'

20 house on December 14.  Therefore, according to the County's own understanding of the

21 holding in <u>de Villers v. County of San Diego</u>, 156 Cal.App. 4th 238 (2007), at the very least,

22 the County would be subject to liability on a vicarious liability theory.  (<u>See</u> Motion,

23 p.17:17-24.)  The County may also be directly liable for gross negligence in the provision of

24 emergency medical care, pursuant to Cal. Health & Safety Code § 1799.107.  <u>Eastburn v.</u>

25 <u>Regional Fire Protection Authority</u>, 31 Cal.4th 1175, 1185-86 (2003).

26

27

28

**2. Plaintiffs Have Stated a Claim Under a California "Special Relationship."**

Under California law, Plaintiffs' allegations are also sufficient to state causes of action for wrongful death and survival action against the County on a "special relationship" theory. By locking down the scene, by refusing to let Kristin be taken to the hospital, and by affirmatively undertaking to provide emergency medical services, sheriff's deputies created a "special relationship" under California State law and a situation of dependency resulting in detrimental reliance. Accordingly, Plaintiffs' state law claims for wrongful death and survival action state valid causes of action under a state law "special relationship" theory. Clemente v. State of California, 40 Cal. 3d 202 (1985); Williams v. State of California, 34 Cal. 3d 18 (1983); McCorkle v. City of Los Angeles, 70 Cal.2d 252 (1969).

In Clemente v. State of California, 40 Cal. 3d 202 (1985), the California Supreme Court recognized that conduct that creates "a situation of dependency resulting in detrimental reliance may give rise to a duty of care and . . . there may be a duty to refrain from conduct which prevents others from giving assistance." Id. at 213 (quoting Williams v. State of California, 34 Cal. 3d 18 (1983)). In Williams v. State of California, 34 Cal. 3d 18 (1983), the California Supreme Court stated that a "special relationship" may be predicated on detrimental reliance upon "the *conduct* of a police officer, in a situation of dependency, result[ing] in detrimental reliance on him for protection." Id. at 25. But, there must be an affirmative act which created the peril, contributed to, increased, or changed the risk *or prevented others' assistance.* Id. at 27-28. Referring to the specific facts of the case before it, the Court stated:

> [A]lthough no special relationship may exist between members of the California Highway Patrol and the motoring public generally, or between the Patrol and stranded motorists generally [citation], when the state, through its agents, voluntarily assumes a protective duty toward a certain member of the public and undertakes action on behalf of that member, thereby inducing reliance, it is held to the same standard of care as a private person or organization.

1  Williams, 34 Cal. 3d at 24.

2      In this case, the County, through its agents, assumed a protective duty toward Kristin

3  when it locked down the scene and took her into its custody. It further affirmatively acted,

4  contributed to, increased, and changed the risk by providing negligent medical care. Finally,

5  by refusing to allow Kristin to be taken to the hospital, and by refusing to allow Jim and Kay

6  to attend to Kristin, it prevented others' assistance. Under these circumstances, the County

7  created a "special relationship" and a situation of dependency, giving rise to a duty of care.

8  Accordingly, pursuant to the California Supreme Court's decisions in Clemente v. State of

9  California and Williams v. State of California, Plaintiffs have stated valid causes of action

10  for wrongful death and survival action.

11      The cases Defendant relies on are all inapplicable, as they do not involve affirmative

12  acts. In Davidson v. City of Westminster, 32 Cal.3d 197 (1982), the police failed to act, and

13  the plaintiff was not aware of the officers' presence, and did not rely upon them for

14  protection. Id. at 208. In Adams v. City of Fremont, 68 Cal.App. 4th 243 (1998), police

15  officers allegedly failed to prevent a person with a loaded firearm from carrying out a

16  threatened suicide. The Court of Appeal stated that defendants owed no duty of care to

17  prevent the decedent from committing suicide. Id. at 248. In Von Batsch v. American Dist.

18  Telegraph Co., 175 Cal.App. 3d 1111 (1985), the county sheriff's department failed to

19  inspect a roof after responding to a burglar alarm hours before decedent's death, and the

20  intruders who killed decedent allegedly entered the building through holes in the roof. The

21  court held that sheriff's deputies had not voluntarily assumed any responsibility to inspect

22  the roof or to protect plaintiff from future harm, had not undertaken to guarantee decedent's

23  safety, had not created the peril to decedent, and had taken no affirmative action that

24  contributed to, increased, or changed the risk otherwise existing. Id. at 1124.

25      In Minch v. California Highway Patrol, 140 Cal.App. 4th 895 (2006), another case

26  the County relies on, the plaintiff tow-truck driver was injured while he was working at the

27  scene of a traffic accident, when a passing motorist lost control of his vehicle. Minch

28

---

1   alleged that the California Highway Patrol officers at the scene were negligent in failing to

2   properly monitor and/or regulate traffic within the vicinity of the accident scene. <u>Minch</u>,

3   140 Cal.App. 4th at 898. The Court of Appeals affirmed summary judgment, finding that

4   the CHP officers did not owe a duty of care to plaintiff. In the Court's opinion, it was

5   significant that:

6           [The CHP] did not create the risk of harm. After plaintiff extracted
            the Jetta, <u>they did not direct him to stay at the scene or tell him where</u>
7           <u>to park</u>. They did not lock the passenger door of the tow truck, thus
            compelling plaintiff to walk on the traffic side of the truck. <u>Plaintiff</u>
8           <u>was not in a position of dependency on the officers</u>, and they did not
            say anything to indicate that they would guarantee his safety.
9           <u>Plaintiff could not have detrimentally relied upon the officers'</u>
            <u>conduct</u> when he walked toward the cab of the truck to retrieve his
10          receipt book; at that time, he was fully aware that Sergeant Zambrana
            had departed and, by plaintiff's testimony, Officer Larios was behind
11          the Jetta talking to the owner.

12

13  <u>Minch</u>, 140 Cal.App. 4th at 906-907 (emphasis added). The other cases cited by the County,

14  <u>Lopez v. City of San Diego</u>, 190 Cal.App. 3d 678 (1987), <u>Jackson v. Clements</u>, 146

15  Cal.App. 3d 983 (1983), <u>Shelton v. City of Westminster</u>, 138 Cal.App. 3d 610 (1982),

16  similarly involved failures to act and are, therefore, inapplicable.

17          The County's Motion highlights the distinction between this case and the cases it

18  relies on. Unlike the circumstances in the cases the County cites, this case involves

19  <u>affirmative actions</u> by the deputies at the scene. In this case, the County's employees took

20  control of the scene and took physical control of Kristin. Kristin was in the County's

21  custody and under its control and protection for nearly an hour while it refused to allow her

22  to be transported to the hospital. The County's deputies voluntarily assumed a responsibility

23  for Kristin by locking down the scene, by taking physical control of her, by refusing to allow

24  her to be taken to the hospital and by refusing to permit Jim or Kay to attend to her. At the

25  very least, these actions created a dependency situation and necessarily caused Plaintiffs to

26  rely on Defendant. For these reasons, Plaintiffs have alleged a "special relationship" under

27  California state law. Accordingly, Plaintiffs have adequately alleged a duty of care on the

28

1  part of the County and have stated valid causes of action for wrongful death and survival

2  action.

3      **E.**    **Defendant's Claim of "An Incurable Conflict of Interest" Is Frivolous.**

4      Defendant's claim that there is an "incurable conflict" between the interests of Jim

5  and Kay Maxwell and Kristin's children, Trever and Kelten is utterly specious. According

6  to the County, this supposed conflict arises because, if Plaintiffs "allege that the County

7  caused [Kristin's] suffering and death," Trever and Kelten "could make almost-identical" –

8  albeit "unfair" and "far-fetched" – allegations against Jim and Kay. Defendant fails to cite a

9  single actual conflict of interest between Jim and Kay and Trever and Kelten, or even a

10  single non-frivolous *potential* conflict. Instead, it throws against the wall an assortment of

11  alleged *potential* claims, each of which is patently frivolous.

12      First, Defendant claims that if it can be held liable for hiring and providing a weapon

13  to Bruce, who it knew was psychologically-unfit and violence-prone, then Trever and Kelten

14  could allege that Jim and Kay are liable, because they also knew about Mr. Bruce's

15  psychological shortcomings and allowed him to bring a gun into their house, where he shot

16  his wife. (Motion, pp.11:14-18.) Defendant's claim that Jim and Kay also knew Bruce was

17  psychologically unfit before he shot Kristin is completely unsupported, and is not based on

18  any facts alleged in the complaint. Defendant's parenthetical, ("how else could they allege"

19  Bruce's psychological shortcomings) implies that the only way Plaintiffs could have alleged

20  in their complaint that Defendant knew Bruce was psychologically unfit when he was hired

21  is if they already had the same information. Defendant's nonsensical argument is not based

22  on any facts alleged in the complaint, and, by ignoring the fact that Plaintiffs' complaint was

23  filed a year after Kristin's death, it overlooks several obvious ways in which Plaintiffs could

24  have learned the information after the death of their daughter.

25      Defendant next argues that if it can be held liable for delaying medical care, Trever

26  and Kelten could allege that Jim and Kay also delayed medical care. Defendant's second

27  example ignores the following facts: first, Kristin had already called 911; second,

28

1    Defendant's deputies locked down the scene and refused to allow Kristin to be taken to the

2    hospital; third, Defendant's deputies refused to allow Jim and Kay to attend to Kristin.

3    Thus, Defendant's argument that Jim and Kay "could have avoided those delays by

4    immediately driving [Kristin] to the nearest hospital" is frivolous.

5         Defendant's final example of how an "incurable conflict" could arise is that if

6    Defendant's deputies "acted badly" because Bruce was "one of their own," Bruce was also

7    one of Jim and Kay's "own" since he was a "resident of their house and a member of their

8    family" and they "made no effort to call for help." (Motion, p.12:8-13.) Again, at the risk

9    of taking Defendant's arguments seriously, the County ignores the fact that help had already

10   been called.

11        All of the cases cited by Defendant involved actual conflicts. Defendant cites

12   Tsakos Shipping and Trading, S.A. v. Juniper Garden Town Homes, Ltd., 12 Cal.App. 4th

13   74, 95 (1993), for the proposition that attorneys "may not assume positions inconsistent with

14   the interests of their clients." Defendant has not pointed to a single example where

15   Plaintiffs' attorneys have "assume[d] positions inconsistent with the interests of their

16   clients." Nor do any of Defendant's outlandish examples reveal any actual conflict. None

17   of Defendant's examples even reveal a non-frivolous *potential* conflict, much less an

18   incurable conflict. The Court should flatly reject Defendant's argument that there is an

19   "incurable conflict" between the interests of Jim and Kay and the interests of Trever and

20   Kelten.

21   **F.   Defendant is Not Entitled to a "More Definite Statement" as to Plaintiffs'**
22        **Eighth and Ninth Causes of Action.**

23        Plaintiffs' eighth and ninth causes of action for intentional and negligent infliction of

24   emotional distress allege that the County engaged in outrageous, non-privileged conduct

25   with reckless disregard of the probability of causing mental anguish and emotional and

26   physical distress to all Plaintiffs by (1) gross negligence in the provision of emergency

27   services to Kristin, (2) unlawful detainment and false imprisonment of Jim and Kay, and (3)

28

1  causing the media to believe that Jim was a suspect who had been arrested for the shooting

2  of his daughter. (Complaint, ¶¶ 8, 84.)  In the face of these allegations against it, the County

3  claims to be unable to "identify events or circumstances . . . sufficient to formulate a

4  meaningful answer." (Motion, p.25:8-10.)  Without citing any legal authority, and based

5  solely on its purported inability to understand that it is alleged to have (1) been grossly

6  negligence in the provision of emergency services to Kristin, (2) unlawfully detained and

7  falsely imprisoned Jim and Kay, and (3) caused the media to believe that Jim was a suspect

8  who had been arrested for the shooting of his daughter, the County claims it is entitled to a

9  more definite statement.  The County's argument has no merit whatsoever, and the Court

10  should deny the County's request.

11        First, the County's contention that it is unable to determine the basis for Plaintiffs'

12  claims for intentional and negligent infliction of emotional distress is refuted by the plain

13  language of the complaint.  Plaintiffs allege the County (1) was grossly negligent in the

14  provision of emergency services to Kristin, (2) unlawfully detained and falsely imprisoned

15  Jim and Kay, and (3) caused the media to believe that Jim was a suspect who had been

16  arrested for the shooting of his daughter. (Complaint, ¶¶ 78, 84.)

17        With respect to the County's argument that certain allegations are "unanswerable,"

18  both of the County's examples are easily answered with a simple statement that the County

19  admits the allegation, denies the allegation, or lacks information sufficient to allow it to

20  admit or deny.  For example, the County could admit that its incompetence caused the news

21  media to believe Jim was a suspect, but deny or aver lack of information concerning

22  arrogance.  With respect to its alleged mistreatment of Trever and Kelten, one would think

23  the County could answer this allegation without the benefit of a more definite statement.

24  Plaintiffs' Eighth and Ninth Causes of Action clearly notify the County of the allegations

25  against it.  Accordingly, the Court should not require a more definite statement.  See

26  Swierkiewicz v. Sorema N. A., 534 U.S. 506 (2002).

27

28

V.    **THE COURT SHOULD GRANT PLAINTIFFS LEAVE TO AMEND.**

Pursuant to Federal Rule of Civil Procedure 15(a), Plaintiffs request leave to amend their complaint in order to clearly state a claim under City of Canton v. Harris, 489 U.S. 378 (1989), for Monell liability based on adequate training.  Inadequacy of police training may serve as the basis for § 1983 liability where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact.  Canton, 489 U.S. at 388; Munger v. City of Glasgow, 227 F.3d 1082, 1088 (9th Cir. 2000).  To prevail on a Canton claim, a plaintiff "must have sufficiently alleged that: (1) [he] was deprived of his constitutional rights by the City acting under color of state law; (2) that the City has customs or policies which amount to deliberate indifference to [his] constitutional rights; and (3) that these policies were the moving force behind the constitutional violations." Estate of Amos v. City of Page, 257 F.3d 1086, 1094 (9th Cir. 2001) (internal quotes omitted).

In this case, Plaintiffs have made the requisite allegations, but, as in Munger and Estate of Amos, they have not specifically alleged a "failure to train."  To paraphrase the Court in Munger, however, the adequacy of the deputies' training is called into question by their inappropriate handling of a person who was obviously injured and in serious need of immediate medical attention.  Possibly the Sheriff's Department failed to give necessary training to its deputies regarding the special dangers posed by these circumstances.  Munger, 227 F.3d at 1088.

Leave to Amend should be liberally granted.  Scott v. Eversole Mortuary, 522 F.2d 1110 (9th Cir.1975).  A separate motion is not required, and it is sufficient for Plaintiffs to request leave in their opposition to the County's Motion To Dismiss.  Balistreri v. Pacifica Police Dept., 901 F.2d 696, 700-701 (9th Cir. 1990); Scott v. Eversole Mortuary, 522 F.2d 1110 (9th Cir.1975); Edwards v. Occidental Chemical Corp., 892 F.2d 1442, 1445 n. 2 (9th Cir.1990) (request for leave to amend should have been granted even though request appeared in opposition to motion for summary judgment and was not formally tendered).

1   Accordingly, Plaintiffs here should be permitted to amend their complaint to allege a <u>Monell</u>

2   violation based on inadequate training.

3   **VI.**   **CONCLUSION**

4         Based on all of the foregoing, Plaintiffs respectfully request that the Court deny

5   Defendant's Motion To Dismiss. Plaintiffs further request that the Court grant them leave to

6   amend their complaint.

7

8   Dated: February 5, 2008               CHARLES G. LA BELLA
                               STEVEN T. COOPERSMITH

9                                  LA BELLA & MCNAMARA, LLP

10                                  TODD D. THIBODO
                               LAW OFFICES OF TODD D. THIBODO

11                                  A PROFESSIONAL CORPORATION

12

13                      By: <u>**/s/Steven T. Coopersmith**</u>
                             Steven T. Coopersmith

14                              Charles G. La Bella
                             Attorney for PLAINTIFFS

15                              Email: scoopersmith@labellamcnamara.com
                                   clabella@labellamcnamara.com

16

17

18

19

20

21

22

23

24

25

26

27

28

CASE NO. 07 CV-2385-JAH (WMc)

PLAINTIFFS' MEMO OF Ps AND As IN OPPOSITION TO DEFENDANT COUNTY'S MOTION TO DISMISS

1                            <u>PROOF OF SERVICE</u>

2 *Maxwell v. County of San Diego, et al.*
United States District Court of the Southern District of California

3 Case Number: 07 CV-2385-JAH (WMc)

4 I, Allison M. Trask, declare as follows:

5      I am an employee of a member of the bar of this Court at whose direction was made in

6 the County of San Diego, State of California. I am over the age of 18 and not a party to the

7 within action; my business address is 401 West "A" Street, Suite 1150, San Diego, California

8 92101.

9      On February 5, 2008, I served the foregoing document(s) described as:

10 **PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN**
**OPPOSITION TO DEFENDANT COUNTY OF SAN DIEGO'S MOTION TO**

11 **DISMISS**

12 on interested parties in this action by placing ☐ the original ☒ true copy(ies) thereof

13 enclosed in sealed envelopes as follows:

14 John J. Sansone, County Counsel        *Counsel for Defendant County of San*
Morris G. Hill, Senior Counsel          *Diego*

15 1600 Pacific Highway, Room 355
San Diego, CA 92101-2469

16 Email: morris.hill@sdcounty.ca.gov

17
Phillip C. Samouris                 *Counsel for Defendant Viejas Fire*

18 Michelle L. Grant                   *Department*
Higgs, Fletcher & Mack LLP

19 401 West "A" Street, Suite 2600
San Diego, CA 92101-7913

20 Email: samouris@higgslaw.com

21        grantm@higgslaw.com

22 Kevin Osterberg                   *Counsel for Defendant Alpine Fire*
Stephen M. Caine                 *Protection District*

23 Haight Brown & Bonesteel LLP
3750 University Avenue, Suite 240

24 Riverside, CA 92501-3313

25 Email: kosterberg@hbblaw.com
     scaine@hbblaw.com

26

27 ☒ **BY EMAIL/ECF** by electronically filing the foregoing with the Clerk of the District Court

28 using its ECF System, which electronically notifies them via email as indicated above.

1  ☒ **By First Class Mail** I am readily familiar with the firm's practice of collection and

2  processing correspondence for mailing with the United States Postal Service.  Under that

3  practice, it would be deposited with United States postal service on that same day with postage

4  thereon fully prepaid at San Diego, California in the ordinary course of business.  The envelope

5  was sealed and placed for collection and mailing on that date following ordinary business

6  practices.

7  ☐ **By Overnight Delivery** I am readily familiar with the firm's practice of collection and

8  processing correspondence for mailing with Overnite Express and Federal Express.  Under that

9  practice, it would be deposited with Overnite Express and/or Federal Express on that same day

10  thereon fully prepaid at San Diego California in the ordinary course of business.  The envelope

11  was sealed and placed for collection and mailing on that date following ordinary business

12  practices.

13  ☐ **By Facsimile** Based on agreement of the parties to accept service by fax transmission, I

14  faxed the documents on this date to the person(s) at the fax numbers listed.  No error was

15  reported by the fax machine that I used.  A copy of the record of the fax transmission, which I

16  printed out, is attached.

17  ☐ **By Personal Service** I served the documents by placing them in an envelope or

18  package addressed to the person(s) at the addresses listed and providing them to a professional

19  messenger service for service on this date.

20  ☐ (STATE) I declare under penalty of perjury under the laws of the State of California that

21  the above is true and correct.

22  ☒ (FEDERAL)  I declare that I am employed in the office of a member of the bar of this

23  court at whose direction the service was made.

24      Executed February 5, 2008, in San Diego, California.

25

26                                      /s/ Allison M. Trask

27                                      Allison M. Trask

28

- 2 -

Case No. 07cv2385-JAH(WMc)
- Proof of Service-